**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
236 Tillou Road
South Orange, NJ  07079
Tel:  (973) 313-1887
Fax: (973) 833-0399

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RODNEY OMANOFF, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiffs,<br><br>              vs.<br><br>PATRIZIO & ZHAO LLC; P&K CPAs LLC; XINGGENG (JOHN) ZHAO; AND JOHN G. PATRIZIO,<br><br>         Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff  Rodney Omanoff, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this class action complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by counsel, *inter alia*: (a) review and analysis of relevant filings made by Keyuan Petrochemicals, Inc.

1

("Keyuan" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Keyuan's public documents; (c) information readily obtainable on the Internet; and (d) review and analysis of public documents concerning Keyuan's independent auditor the defendants Patrizio & Zhao LLC ("P&Z"), P&Z's successor-in-interest P&K CPAs LLC, Xienggeng (John) Zhao ("Zhao"), and John G. Patrizio ("Patrizio").

## ALLEGATIONS

1.     This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired the securities of Keyuan during the period between August 16, 2010 to October 7, 2011, inclusive, seeking to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and on behalf of all persons other than Defendants who purchased Keyuan securities pursuant to the confidential private offering memorandum dated March 22, 2010 ("Offering Documents"), consisting of purchasers in the first tranche that closed on April 22, 2010 and the second tranche that closed on May 18, 2010 (collectively the "Private Placement").   The open market period and the Private Placement are collectively referred to herein as the "Class Period."

2.     Non-Party Keyuan, a company headquartered in the People's Republic of China ("PRC"), claimed to earn millions in sales.

2

3.     During the Class Period, Keyuan's auditor, P&Z issued materially misleading "clean" interim reports for Keyuan's financial statements for the second and third quarters of 2010.

4.     Contrary to what Defendants stated in their interim reports, Defendants knowingly misled investors by failing to disclose Keyuan's known material related party transactions in issuing its "clean" interim reports of Keyuan's financial statements.

5.     When other entities, such as the SEC, began to ask questions of Keyuan that Defendants were required to ask in auditing and/or reviewing Keyuan's financial statements –they readily discovered the material undisclosed related party transactions.

6.     Had Defendants conducted its audits and reviews of Keyuan in accordance with PCOAB standards as they claimed they did, P&Z could not have issued the clean audit reports and interim reviews of Keyuan.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

9.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C.  § 78aa, 28 U.S.C.  § 1391(b) and § 1391 (d).

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the NASDAQ.

## PARTIES

11.     Plaintiff  Rodney Omanoff purchased Keyuan securities at artificially inflated prices during the Class Period and in the Private Placement and has been damaged thereby, as set forth in the accompanying certification.

12.     Defendant Patrizio & Zhao LLC is an auditing and accounting firm, headquartered in Parsippany, New Jersey.  During the Class Period, P&Z issued interim reports for Keyuan's financial statements for the second and third quarters of 2010 filed on Forms 10-Q with the SEC and audit reports for Keyaun's 2008 and 2009 financial statements in connection with the Private Placement. P&Z merged with the firm of  RK Associates of NJ LLC and as of January 2014 is now known as P&K CPAs LLC.

4

13.     P&K CPAs LLC ("P&K") is the successor in interest of Patrizio & Zhao LLC. P&K is the resulting firm of the merger of Patrizio & Zhao LLC with RK Associates of NJ, LLC that took place in 2014.

14.     Defendant Xinggeng (John) Zhao is a Chinese citizen and resident of Montville, New Jersey. Zhao is a certified public accountant ("CPA") and founding partner of P&Z. Zhao heads P&Z's China practice and was the engagement partner on Keyuan's audits and interim reviews. Zhao is currently one of three partners of P&K.

15.     Defendant John G. Patrizio is a CPA and the managing partner of P&Z. During the Class Period, Patrizio managed P&Z's day-to-day operations and provided accounting and auditing services to clients.  Currently, Patrizio is listed as the managing partner of P&K.

16.     P&Z, P&K, Zhao, and Patrizio are collectively referred to herein as Defendants.

## RELEVANT NON PARTIES

17.     Keyuan Petrochemicals, Inc., ("Keyuan") is a Nevada corporation, headquartered in PRC. Through its operating subsidiaries, Keyuan manufactures and sells petrochemical products in PRC.

18.     On September 30, 2013 the SEC filed a settled enforcement against P&Z and Zhao instituting sanctions and remedial measures against P&Z and Zhao for

engaging in improper professional conduct when they misled investors by issuing misleading audit reports and interim reports in connection with the same undisclosed related party transactions asserted herein,  entitled *In the Matter of Patrizio & Zhao LLC and Xinggeng (John) Zhao, CPA*, File No. 3-15534 (the "SEC Action").

## SUBSTANTIVE ALLEGATIONS

### Defendants Issue Clean Interim Reports for Keyuan

19.     The Class Period begins with the Private Placement.  Keyuan through its placement agent TriPoint Global Equities, LLC offered and sold $30 million of units consisting of 6% series A convertible preferred stock, common stock, and warrants to purchase common stock of Keyuan through a Private Placement memorandum. Attached to memorandum was the audited financial statements of Keyuan for the fiscal years ended December 31, 2009 and 2008; and a PowerPoint presentation prepared by TriPoint Global Equities, LLC (collectively the "Offering Documents."). The financial statements were audited by P&Z and included a clean audit report.

20.     The Private Placement was offered pursuant to SEC Regulation D (17 C.F.R. §230.500) which exempted the offering from the registration requirements of Section 5 of the Securities Act of 1933.   Therefore, pursuant to 17 C.F.R. §230.502(b), et seq., Keyuan was required to provide financial statements to investors that complied with GAAP and SEC regulation.

21.     The Offering Documents were uniformly presented to each prospective and actual purchaser of the Private Placement.  While the Offering Documents had sections for related party transactions and the audited financial statements that purported to comply with GAAP and SEC regulations, none of the related party transactions complained of herein was disclosed in the Offering Documents, rendering the financial statements and P&Z's audit report materially misleading.

22.     The first tranche of the Private Placement was consummated on April 22, 2010 for the issuance and sale of 661,562 units at a purchase of $35 per unit, consisting of an aggregate of:

(a)     5,954,058 shares of Series A convertible preferred stock, par value $0.001 per share convertible into the same number of shares of Common Stock;

(b)     661,562 shares of Common Stock;

(c)     three-year Series A Warrants to purchase up to 661,562 shares of Common Stock at an exercise price of $4.50 per share; and

(d)     three-year Series B Warrants to purchase up to 661,562 shares of Common Stock at an exercise price of $5.25 per share,  for aggregate gross proceeds of approximately $23.2 million.

23.     On May 18, 2010, the Company closed the second tranche of the Private Placement for the issuance and sale of 87,142 units at a purchase price of $35 per unit, consisting of an aggregate of:

(a)     784,278 shares of Series A convertible preferred stock, par value $0.001 per share convertible into the same number of shares of Common Stock;

(b)     87,142 shares of Common Stock;

(c)     three-year Series A Warrants to purchase up to 87,142 shares of Common Stock at an exercise price of $4.50 per share; and

(d)     three-year Series B Warrants to purchase up to 87,142 shares of Common Stock at an exercise price of $5.25 per share, for aggregate gross proceeds of $3,049,970.

24.     August 16, 2010 when Keyuan filed its Form 10-Q with the SEC for the second quarter of 2010.  Included in the 10-Q is P&Z's materially misleading interim report about Keyuan's third quarter financial statements.  P&Z's interim report states:

Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders
Keyuan Petrochemicals, Inc.

We have reviewed the accompanying consolidated balance sheet of Keyuan Petrochemicals, Inc. (the "Company") as of June 30, 2010, and the related consolidated statements of operations and comprehensive income (loss) for the three months and six months ended June 30, 2010 and 2009, and the

consolidated statements of cash flows for the six months ended June 30, 2010 and 2009. These consolidated financial statements are the responsibility of the Company's management.

**We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States).** A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, **we are not aware of any material modifications that should be made to the accompanying financial statements referred to above for them to be in conformity with accounting principles generally accepted in the United States of America.**

/s/ PATRIZIO & ZHAO, LLC
Parsippany, New Jersey
August 6, 2010

25.    On November 15, 2010, Keyuan filed its Form 10-Q with the SEC for the third quarter of 2010. Included in the 10-Q is P&Z's materially misleading statement about Keyuan's financial statements.  P&Z's  interim report states:

Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders
Keyuan Petrochemicals, Inc.

We have reviewed the accompanying consolidated balance sheet of Keyuan Petrochemicals, Inc. (the "Company") as of September 30, 2010, and the related consolidated statements of operations and comprehensive income

(loss) for the three months and nine months ended September 30, 2010 and 2009, and the consolidated statements of cash flows for the nine months ended September 30, 2010 and 2009. These consolidated financial statements are the responsibility of the Company's management.

**We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States).** A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

**Based on our review, we are not aware of any material modifications that should be made to the accompanying consolidated financial statements referred to above for them to be in conformity with accounting principles generally accepted in the United States of America.**

/s/ PATRIZIO & ZHAO, LLC

Parsippany, New Jersey
November 15, 2010

26.    P&Z's interim reports were misleading because P&Z's reviews of Keyuan were not conducted in accordance with PCAOB standards.

27.    Had P&Z conducted its audits in accordance with the PCAOB Standards (*i.e.* Generally Accepted Auditing Standards or "GAAS") as stated, P&Z could not

have issued the clean interim reports it did, and would have easily and readily revealed that Keyuan was engaged in material undisclosed related party transactions.

28.   P&Z knowingly failed to disclose related party transactions worth in the hundreds of millions dollars.

## THE UNDISCLOSED RELATED PARTY TRANSACTIONS

29.   According to Keyuan's 2010 10-K filed with the SEC on October 20, 2011, Keyuan admitted that it failed to disclose and should have disclosed the following related party sales of products in its periodic reports filed with SEC:

| Sales to Related Parties | | |
|---|---|---|
| **Related Party** | **Year ended December 31,** | |
| | 2009 | 2010 |
| Ningbo Kewei Investment Co., Ltd. ("Ningbo Kewei") | $4,869,959 | -- |
| Ningbo Kunde Petrochemical Co, Ltd. ("Ningbo Kunde") | $14,121,663 | $101,680,459 |
| Ningbo Wanze Chemical Co., Ltd ("Ningbo Wanze") | $2,500,021 | -- |
| Ningbo Zhenhai Jinchi Petroleum Chemical Controlled by Mr. Shou Co., Ltd ("Zhenhai Jinchi") | -- | $10,180,273 |
| **Total Related Party Sales** | $21,491,643 | $111,860,732 |

30.   The related party sales were a material percentage of the Company's total sales.

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |

| | | |
|---|---|---|
| **Total Related Party Sales:** | $21,491,643 | $111,860,732 |
| **Total Sales** | $68,653,603 | $558,752,069 |
| **Percentage of Total Sales to Related Parties** | 31% | 20% |

31.    Keyuan also admitted in its 2010 10-K that it failed to disclose and

should have disclosed the related nature of certain other sales:

| | Year ended December 31, | |
|---|---|---|
| | **2009** | **2010** |
| Ningbo Litong Petrochemical Co., Ltd ("Ningbo Litong") | $17,922,288 | $29,625,766 |

32.    Keyuan admitted in its 2010 10-K that it failed to disclose and should

have disclosed the following purchases of raw materials from related parties:

| **Purchase of Raw Material Purchases From Related Parties** | | |
|---|---|---|
| | Year ended December 31, | |
| | 2009 | 2010 |
| Ningbo Kewei | $952,594 | $4,465,563 |
| Ningbo Kunde | $3,777,986 | $20,549,245 |
| **Total** | $4,730,580 | $25,014,808 |

33.    The purchases of raw material from related parties was a material amount

of the Company's raw material inventory:

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| **Total Raw Material Purchases From Related Parties** | $4,730,580 | $25,014,808 |
| **Total Raw Materials** | $12,922,654 | $53,160,604 |
| **Percentage of Raw Materials from Related Parties** | 36% | 47% |

34.     Keyuan also admitted in its 2010 10-K that it failed to disclose and should have disclosed additional purchases of raw material due to its related nature:

|  | Year ended December 31, | |
|---|---|---|
|  | 2009 | 2010 |
| Ningbo Litong | $3,280,566 | $18,994,104 |

35.     Keyuan admitted in its 2010 10-K that it failed to disclose and should have disclosed additional related party transactions involving among, other things, accounts receivable to the Company from related parties, and financing transactions between related parties.

36.     Keyuan through its quarterly and restated quarterly reports it filed with the SEC on November 1, 2011, admitted that it should have disclosed the above related party transactions in its interim 2010 and 2009 quarterly periods, when those financial statements were first issued.

37.     In Keyuan's restated 10-Q for the second quarter ended June 30, 2010 filed with the SEC on November 1, 2011, the Company admitted that it failed to disclose and should have disclosed the following related party sales and purchases of raw material from related parties:

| Sales to Related Parties | | | | |
|---|---|---|---|---|
|  | Three Months ended June 30, | | Six Months ended June 30 | |
|  | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kunde | -- | $22,424,477 | -- | $43,228,614 |
| Zhenhai Jinchi | -- | $3,941,976 | -- | $3,958,248 |

| Purchases of Raw Materials from Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended June 30, | | Six Months ended June 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kewei | -- | -- | -- | $4,427,831 |
| Ningbo Kunde | -- | -- | -- | $1,308,488 |

38.    In Keyuan's restated Form 10-Q for the third quarter ended September 30, 2010 filed with the SEC on November 1, 2011, the Company admitted that it failed to disclose and should have disclosed the following related party sales and purchases of raw material from related parties:

| Sales to Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended September 30, | | Nine Months ended September 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kunde | $7,362,101 | $35,723,405 | $7,362,101 | $79,072,843 |
| Zhenhai Jinchi | -- | $2,940,964 | -- | $6,910,274 |

| Purchases of Raw Materials from Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended September 30, | | Nine Months ended September 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kewei | -- | -- | -- | $4,440,207 |
| Ningbo Kunde | $2,530,203 | $14,154,723 | $2,530,203 | $15,409,928 |

## THE UNDISCLOSED RELATED PARTY TRANSACTIONS WERE NOT ARM'S LENGTH TRANSACTIONS

39.    The undisclosed related party transactions personally benefited Keyuan insiders and were not arm's length transactions.

40.     The gross profit margin on related party sales was significantly smaller than the profit margins Keyuan realized from non-related party sales.   Stated differently, dollar-for-dollar Keyuan was earning less profit from sales related parties than it was on sales to non-related parties.

41.     For example, for Q3 2010 the gross profit margin on the related party sales was 11.4%, yet it was 25.2%% for the external sales.

42.     Not surprisingly, in the Company's 2010 10-K filed with the SEC on October 20, 2010 that set forth the  restatement adjustments above, the Company's auditor took the drastic step of qualifying its audit opinion by explaining that:

> The Company has significant transactions and relationships with related parties and certain other parties which are described in Note 24 to the consolidated financial statements. It is possible that the terms of these transactions may not be the same as those that would result from transactions among unrelated parties.

43.     The Company admitted that it committed crimes in connection with the related party transactions.   In the 2010 10-K Keyuan revealed that:

> [W]e engaged in certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans.  Though we are current on our loan payments and as a general rule, the risk of prosecution and or civil liabilities is diminished if the loans have been repaid,

we are advised that such practices may have been in violation of PRC banking laws.
44.

## PRIOR TO THE SECOND AND THIRD QUARTERS OF 2010 INTERIM REPORTS OF KEYUAN, P&Z WAS AWARE OF RED FLAGS RELATING TO THE ACCURACY OF KEYUAN'S FINANCIAL STATEMENTS

45.     Defendants knowingly ignored red flags and did not investigate contradictions supplied by Keyuan's management thereby failing to abide by PCAOB standards. Zhao asked Keyuan's Vice President of Accounting to give P&Z a list of related parties and related party transactions. Keyuan told Zhao that there were no related parties or related party transactions. While engaged in their work, P&Z audit staff received a list from Keyuan of related party transactions that contradicted what other Keyuan management earlier told Zhao. Zhao did not take further action to look into the contradictory statements Keyuan's management told him and what P&Z uncovered during the course of the audit.  By turning a blind eye, P&Z and Zhao violated, among others, the following PCAOB standards.

46.     Under PCAOB Standard AU Section 316 (Consideration of Fraud in a Financial Statement Audit), an auditor is required to plan an audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." Pursuant to this standard, the auditor should discuss among engagement personnel the risk of material misstatement due to

fraud, and obtain information needed to identify such risk, including making inquiries of management and others within the company regarding such risk. (AU Section 316, at .14-.27).

47.    Under PCAOB Standard AU Section 326 (Evidential Matter), an auditor is required to obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. In developing his opinion, an auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. (AU Section 326.25). PCAOB Standards also state that evidential matter obtained from independent sources outside the entity provides greater assurance of reliability than information obtained solely within the entity. (AU Section 326.21). In addressing an identified risk of material misstatement due to fraud, an auditor may need to change the nature, timing and extent of auditing procedures to obtain evidence that is more reliable or to obtain additional corroborative information. For example, more evidential matter may be needed from independent sources outside the audited entity, such as information from public records about the existence and nature of key customers, vendors, or counterparties in a major transaction. (AU Section 316.52)

48.     Under PCAOB Standard AU Section 230 (Due Professional Care in the Performance of Work), auditors are required to exercise due professional care throughout the audit. Due professional care requires that the auditor exercise professional skepticism. Under this standard, "[p]rofessional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."

49.     Under PCAOB Standard AU Section 326.01, an auditor is required to obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. In order to properly conduct an audit and reach its objectives, the auditor must consider the risk of the material misstatements in the financial statement. (AU Section 326.11).

50.     When evaluating related party transactions, auditors should apply necessary procedures to satisfaction concerning the purpose, nature, and extent of these transactions and their effect on financial statements. (AU Section 334.09). An auditor should evaluate all available information concerning a related party transaction and ensure that the transaction is adequately disclosed in the financial statements. (AU Section 334.11). The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be.

51.     Under PCAOB Standard AU Section 230 (Due Professional Care in the Performance of Work), auditors are required to exercise due professional care throughout the audit. Due professional care requires that the auditor exercise professional skepticism. Under this standard, professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. (AU Section 230, at .01-.02, .07-.08.)

52.     Under PCAOB Standard AU Section 311 (Planning and Supervision), an auditor must adequately plan the audit. This standard requires that the auditor obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with PCAOB Standards. That level of knowledge should enable the auditor to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements. Knowledge of the entity's business helps the auditor to identify areas that may need special consideration, assess conditions under which accounting data are produced, processed, reviewed and accumulated within the organization, and evaluate the reasonableness of management representations, among others. (AU Section 311.06). In planning the audit, among other considerations, an auditor should consider matters such as the entity's business, accounting policies and procedures and assessed level of control risk. (AU Section 311.03).

53.     If an accountant, engaged in an interim review, becomes aware of information that leads him to believe that the financial information is not in conformity with GAAP, additional inquires should be made or other procedures should be performed that the accountant considers appropriate to provide a basis for communicating that he is aware of material modifications that should be made to the interim financial information. (AU Section 722.22). An accountant should correct his report if information he believes is necessary for adequate disclosure in conformity with GAAP was not included in the interim financial information. (AU Section 722.43).

54.     Under PCAOB standards, when an auditor becomes aware of information which relates to financial statements previously reported on by him, but which was not known at the date of his report, and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit, he should, as soon as practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report. (AU Section 561.04; *see also* AU Section 722.46).

## TRUTH BEGINS TO EMERGE THROUGH PARTIAL DISCLSOSURES

55.     Prior to market open on April 1, 2011, trading in the Company's stock was inexplicably halted.  The last trade was at $4.88/share.

56.     Later in the morning, Keyuan filed a Form 12b-25 with the SEC announcing that it would not be able to timely file its annual report for the fiscal year ended December 31, 2010 due to issues raised by Keyuan's auditor, KPMG, LLP, relating to "regarding certain cash transactions and recorded sales." The announcement also revealed that the Audit Committee has also commenced an investigation. The Form 12b-25 states:

> In connection with the Registrant's financial statements as at December 31, 2010 and for the fiscal year then ended, issues were raised by the Registrant's independent auditor, primarily relating to unexplained issues regarding certain cash transactions and recorded sales. The independent auditor reported these issues to the Registrant's Audit Committee. The Registrant's Audit Committee has engaged independent legal counsel and commenced an investigation of the issues raised by the Registrant's auditors. Inasmuch as completion of Registrant's 2010 financial statements is dependent, following completion of the Audit Committee's investigation, upon a satisfactory resolution of the issues raised and any other matters that may come to light as a result of further audit procedures, the Registrant was not able to complete its Form 10-K Annual Report by March 31, 2011. Although the Registrant believes that the Audit Committee shall undertake to complete its investigation as soon as practicable, and the Registrant shall use its best efforts to file the Annual Report by April 15, 2011, there can be no assurance that it will be able to do so by such date.

57.     During the afternoon on April 1, 2011, Keyuan filed an 8-K with the SEC reiterating the matters set forth in the SEC filings earlier that day, and announcing that the Company has been informed by its auditor that Keyuan's previously issued financial statements cannot be relied upon. The 8-K states in relevant part:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements

We are in the process of preparing our Annual Report on Form 10-K for the year ending December 31, 2010, which is due on March 31, 2011. In connection with our consolidated financial statements as at December 31, 2010 and for the fiscal year then ended, issues were raised by our independent auditor, primarily relating to the unexplained issues regarding certain cash transactions and recorded sales. The independent auditor reported these issues to our Audit Committee, and our Audit Committee has commenced an investigation of the issues raised. Inasmuch as completion of our 2010 consolidated financial statements is dependent, upon a satisfactory resolution, following completion of our Audit Committee's investigation, of the issues raised and any other matters that may come to light as a result of further audit procedures, we were not able to complete our Form 10-K Annual Report by March 31, 2011. Although we believe that the Audit Committee has undertaken to complete its investigation as soon as practicable, and we will use our best efforts to file the Form 10-K Annual Report by April 15, 2011, there can be no assurance that we will be able to do so by such date.

**In light of the investigation by our Audit Committee, our auditors have informed us that there is a possibility that we may be required to make certain adjustments to certain of our previously issued financial statements, and *that such previously issued financial statements may not be relied upon.*** Although we are hopeful that the results of our Audit Committee's investigation will not require material adjustments or restatements of our historical financial statements, there can be no assurance that this will be the case.

As set forth above, our Audit Committee is conducting an investigation of the above referenced issues raised by our independent auditors during their audit of the financial statements that are to be included in the subject Annual Report. The investigation has just commenced and no conclusions have been reached by the Audit Committee. As it is possible that the issues raised may either result in material changes or restatements of our financial statements previously filed, or be resolved to the satisfaction of both the Audit Committee and the auditors, at this time, we cannot estimate the type of or amount of change that may occur in connection with the audit of our 2010 consolidated financial statements or any financial statements previously filed.

58.     On May 20, 2011, KPMG resigned as the Keyuan's auditor.

59.   On October 6, 2011, Keyuan filed an 8-K that the Company's stock would be delisted from the NASDAQ.

60.   On October 7, 2011, after having been halted since April 1, 2011, the Keyuan's stock began trading over-the-counter on the "Pink Sheets."  The Company's stock opened for trading at $1.05/share (down $3.83/share) and eventually closed at $1.50/share, a decline of $3.38/share or 69%.

61.   On October 19, 2011, the Company filed an 8-K with the SEC that Keyuan's second and third quarters of 2009 10-Qs would be restated, because of, among other things, the need to add "disclosures of our related party transactions to ensure that we include all of the disclosures required under US GAAP and the rules and regulations of the Securities Exchange Commission."

62.   On October 20, 2011 Keyuan filed its annual report for the fiscal year ended December 31, 2010 which provided certain restatement adjustments relating to the undisclosed related party transactions.

63.   On November 1, 2011 Keyuan filed its restated 10-Q of the second quarter ended June 30, 2010, and third quarter ended September 30, 2010.

64.   Facts demonstrating Defendants' scienter were revealed on September 30, 2013 when the SEC filed a settled enforcement action against P&Z and Zhao alleging, among other things, that they engaged in improper professional conduct

when they misled investors in believing that proper PCAOB standards were followed in issuing clean audit and interim review reports issued by P&Z.  According to this SEC Action:

> (a)    Between May 2010 and January 2011, Keyuan filed two registration statements on Form S-1.  During this period, Keyuan further filed quarterly reports for the second and third quarters of 2010 on Form 10-Q. P&Z's audit opinions for 2008 and 2009 were included in Keyuan's registration statements. P&Z's interim review reports for the second and third quarters of 2010 were included in the relevant 10-Qs filed by Keyuan. The audit reports on Form 10-K for the years ending 2008 and 2009 and the interim reports for the second and third quarters of 2010 were all audited by P&Z and failed to disclose material related party transactions.

> (b)    Documents in P&Z's audit workpapers and planning documents noted the existence of related party transactions in the form of loan guarantees, sales, other payables, and notes payables. While some documents specifically noted the existence of related party transactions, others indicated that further procedures and disclosures of related party transactions were necessary.

(c)     Defendants should have investigated further when the list of related parties supplied by Keyuan's management failed to include several entities identified as related parties in audit planning documents or audit workpapers prepared by P&Z staff.

(d)     Defendants did not conduct its audits of Keyuan in accordance with basic PCAOB standards. Even with heightened risk of misstatements due to Keyuan's contradicting information regarding related party transactions, Defendants merely ignored red flags and failed to inquire about these transactions that resulted in Keyuan's materially misleading financial statements. P&Z's audit documentation does not include any indication that P&Z inquired with Keyuan for identification of related parties and related party transactions, or the conflicting statement from management saying there were no such transactions.

(e)     Zhao, acting as the engagement partner for P&Z, did not appropriately supervise his staff and review the audit workpapers. There is no indication that Zhao reviewed the 2008 and 2009 audit testing workpapers, however, on the relevant audit documentation checklists Zhao checked "yes" indicating he was signing off on the workpapers he reviewed. He also checked "yes" indicating that the workpapers

contained reviewer signatures, when in reality, none of the papers contained any evidence of review.

(f)     Additionally, even though there is no engagement completion document by P&Z for the Keyuan audits that specify significant findings or issues, Zhao checked "yes" in an audit documentation checklist indication he either prepared or reviewed this engagement completion document.

(g)     Zhao had inadequate documentation necessary in connection with the 2010 interim reviews. Workpapers did not contain preparer and/or reviewer sign-offs by Zhao or any of the audit staff even though Zhao indicated on a checklist that that he had signed off and dated the workpapers he reviewed. Also, no engagement completion documents were prepared for the interim reviews even though again, Zhao indicated elsewhere that he reviewed and signed-off that such a document was prepared.

(h)     Zhao did not investigate subsequently discovered facts existing as of the date of the P&Z audit reports that could have had an impact on P&Z's opinion on Keyuan's 2008 and 2009 financial statements and the interim reports for first, second and third quarters of 2010. After being

dismissed as Keyuan's auditor, Zhao was informed by Keyuan's senior management that the new auditors refused to sign the 2010 audit report because it had identified off-balance sheet cash accounts and undisclosed related party transactions.

65.     Zhao and P&Z settled with the SEC by agreeing to a three year ban from practicing before the SEC and paying a $30,000 fine.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Keyuan during the Class Period. Excluded from the Class are the officers and directors of the Company and/or P&Z at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the

proposed Class. Members of the Class may be identified from records maintained by Keyuan or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

68.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b) whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of the Company; and
>
> (c) to what extent the members of the Class have sustained damages, and the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72.     Defendants materially misled investors when they signed their interim reports for Keyuan during the Class Period because there were millions of dollars in sales and purchases in undisclosed related party transactions. Additionally, there were also related party guarantees, short-term financing to and from related parties, and accounts payable and receivable to related parties. More than 16 different related party entities were involved in the undisclosed related party transactions.

## Applicability of Presumption of Reliance:

### Fraud-on-the-Market Doctrine

73.     At all relevant times, the market for Keyuan's common stock was an efficient market for the following reasons, among others:

> (a)     The Company's stock met the requirements for listing, and was listed and actively  traded on the NASDAQ, a highly efficient and automated market;

(b)     Several hundreds of thousands of shares of Keyuan stock were traded on a weekly basis, showing a strong presumption of an efficient market;

(c)     As a regulated issuer, Keyuan filed periodic public reports with the SEC and the NASDAQ;

(d)     Keyuan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Keyuan was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)     Unexpected material news about Keyuan was rapidly reflected and incorporated into the Company's stock price during the Class Period.

74.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

### Applicability of Presumption of Reliance:

### *Affiliated Ute*

75.     Neither Plaintiff nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against P&Z, P&K, and Zhao

76.     This first claim is asserted against P&K, P&Z, and Zhao ("First Claim Defendants").

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, First Claim Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Keyuan's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, First Claim Defendants, both collectively and individually, took the actions set forth herein.

79.     First Claim Defendants (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Keyuan's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

80.     First Claim Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Keyuan as specified herein.

81.   First Claim Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

82.   As a result of the dissemination of the materially misleading information and failure to disclose material facts, as set forth above, the market price of Keyuan's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly-traded securities were artificially inflated, and relying directly or indirectly on the omissions of the First Claim Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the

Class Period, Plaintiff and the other members of the Class acquired Keyuan common stock during the Class Period at artificially high prices, and were, or will be, damaged thereby.

83.   At the time of said omissions, Plaintiff and other members of the Class were ignorant of their misleading nature, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding P&Z's interim reports, which was not disclosed by the First Claim Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Keyuan's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

84.   As a direct and proximate result of the First Claim Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Keyuan securities during the Class Period.

85.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**SECOND CLAIM**
**Violation of Section 20(a) Of**
**The Exchange Act Against Zhao and Patrizio**

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     Zhao and Patrizio acted as controlling persons of P&Z within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and his ownership and contractual rights, participation in and/or awareness of the P&Z's operations and/or involvement in the P&Z's audit and review of Keyuan, Zhao and Patrizio had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of P&Z or its audit and review of Keyuan, including the content of P&Z's audit and interim reports.

88.     In particular, Zhao and Patrizio had direct and supervisory involvement in the day-to-day operations of P&Z,  the audit and review of Keyuan and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

89.     As set forth above, P&Z violated Section 10(b) and Rule 10b-5.  By virtue of their positions as controlling persons, Zhao and Patrizio are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the material misstatements alleged herein.  As a direct and proximate result of Zhao and Patrizio's wrongful conduct, Plaintiff and other members of the Class suffered damages in

connection with their purchases of the Company's common stock during the Class Period.

90.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff's and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff's and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Awarding such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: February 4, 2014                    Respectfully submitted,

THE ROSEN LAW FIMR, P.A.

_____

Laurence Rosen, Esq.
236 Tillou Road
South Orange, NJ  07079
Tel:  (973) 313-1887
Fax: (973) 833-0399

Counsel for Plaintiff